JUDGE JONES

OFFICE COPY

William P. Frank
Lauren E. Aguiar
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Plaintiff

'09 CIV 00955

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOCPROP S.à.r.l.,

Plaintiff,

- against –

Aero Toy Store, LLC

Defendant.

08 Civ. ________

**COMPLAINT**

**JURY TRIAL DEMANDED**

1. Plaintiff SOCPROP S.à.r.l. ("SOCPROP"), by and through its counsel, Skadden, Arps, Slate, Meagher & Flom LLP, for its Complaint against Defendant Aero Toy Store, LLC ("ATS"), alleges upon knowledge with respect to itself and its own acts and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

2. This is an action to enforce the terms of an Aircraft Purchase and Sale Agreement between SOCPROP and ATS (the "Agreement"). Pursuant to the contract, ATS agreed to purchase SOCPROP's Global Express Corporate Jet (the "Aircraft") for $45,000,000. The closing date was "anticipated to be on or about July 1, 2008." The

Aircraft had been manufactured, and originally sold to SOCPROP several years earlier, by Bombardier, Inc. -- a leading business aircraft manufacturer.

3. Notably, ATS is a major customer of Bombardier, has frequent commercial dealings with Bombardier, and communicates with Bombardier on a regular basis. ATS has purchased a number of Bombardier aircraft in the past, and values its business relationship with Bombardier.

4. As ATS was aware, SOCPROP also was planning to purchase a *new* corporate jet from Bombardier to replace the Aircraft being sold to ATS. In June 2008, Bombardier notified SOCPROP that the delivery of the new jet to SOCPROP would be delayed. Accordingly, ATS agreed to extend the delivery date for the Aircraft, and SOCPROP and ATS signed an Aircraft Purchase and Sale Agreement Amendment Agreement. This Amendment modified the closing date and made it even less specific than it had been in the original Agreement; the closing date was now "anticipated to be during September 2008."

5. In July 2008, Bombardier informed SOCPROP that delivery of the new jet would be further delayed. As a result, Bombardier communicated directly with ATS regarding the contract with SOCPROP; ATS expressly agreed to further extend the date for delivery of the Aircraft past the "anticipated" date of September 2008. Specifically, ATS and Bombardier agreed to coordinate the delivery of the Aircraft from SOCPROP to ATS, with the delivery of the new jet from Bombardier to SOCPROP. SOCPROP clearly understood that ATS had agreed to, and would accept, delivery of the Aircraft past September 2008. In addition ATS agreed to increase the non-refundable deposit in escrow to $5,000,000 but never fulfilled its promise.

6.       Despite these assurances from ATS and Bombardier that the Aircraft could be delivered past the anticipated September 2008 date, on October 1, 2008, ATS sent SOCPROP a Notice of Default, claiming that unless SOCPROP could comply with all conditions of closing and deliver the Aircraft within ten business days following receipt of the notice, then ATS would terminate the Agreement.

7.       SOCPROP then made repeated attempts to reach an agreed date and destination for ATS to perform its final inspection of the Aircraft (as provided for under the Agreement), but ATS would not identify a destination and refused to discuss a final closing date. This, despite the fact that the Amendment contained flexible language regarding the closing date, and that ATS already had agreed to further extend the closing date.

8.       SOCPROP suggested that ATS perform its final inspection of the Aircraft in Montreal, Canada on October 15, 2008. ATS ignored this suggestion and instead served SOCPROP with a Notice of Termination on October 15.

9.       SOCPROP rejected any purported termination of the Agreement and again suggested that ATS perform its final inspection of the Aircraft in Montreal. ATS did not respond. On November 3, 2008 SOCPROP asked ATS to confirm on or before November 7 that Montreal would be the delivery location of the Aircraft. It informed ATS that it was scheduling the final inspection of the Aircraft for November 10 or 11, at which point the Aircraft would be available for delivery to ATS. ATS responded that it regarded the Agreement as terminated.

10.      SOCPROP made one final offer -- on November 13, 2008 -- for ATS to inspect the Aircraft. ATS, however, did not respond. SOCPROP was left with no choice but

to terminate the Agreement on November 19, 2008, due to ATS's failure to fulfill its obligations to purchase the Aircraft.

11. SOCPROP brings this action to recover damages from ATS for the intentional breach of ATS's obligations under the Agreement.

## THE PARTIES

12. Plaintiff SOCPROP is a private limited liability company organized under the laws of Luxembourg with its principal place of business at Fortis Intertrust, 65 Boulevard, Grand Duchess Charlotte, L-1331 Luxembourg.

13. Defendant ATS is a Florida limited liability company organized under the laws of Florida with its principal place of business at 1710 West Cypress Creek Road, Ft. Lauderdale, Florida 33309.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1332(a)(2). Complete diversity of citizenship between the parties exists, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. This Court has personal jurisdiction over defendant ATS because ATS has consented to the "[e]xclusive jurisdiction and venue ... of, the state and federal courts serving the State of New York, Borough of Manhattan, the City of New York ... over any and all disputes between the parties arising under this Agreement." See Agreement § 7.20. (Exhibit A at 13)

## FACTUAL ALLEGATIONS

ATS and SOCPROP Enter into the Agreement

16.     In February 2008, SOCPROP and ATS entered into discussions regarding the sale of SOCPROP's corporate aircraft, a Global Express Jet, serial number 9076 (the "Aircraft"). The parties appointed Insured Aircraft Title Service, Inc. ("I.A.T.S.") as Escrow Agent. On February 15, 2008, ATS put a deposit of $3,000,000 into escrow with I.A.T.S.

17.     On March 6, 2008, ATS and SOCPROP entered into an Aircraft Purchase and Sale Agreement for the Aircraft (the "Agreement"). A purchase price of $45,000,000 was agreed; with $3,000,000 already in escrow, there was a balance of $42,000,000. See Agreement § 1.1. (Exhibit A at 2-4)

18.     The parties agreed that ATS would be permitted a provisional inspection of the Aircraft, which was to be commenced "on or about March 8, 2008." See Agreement § 3.2. (Exhibit A at 5). Once ATS had performed this provisional inspection, it had until March 20, 2008 to "either reject the Aircraft by notice to the Seller ... or execute and deliver to the Seller the Provisional Acceptance Letter, together with the Addendum thereto, which shall contain a description of all Discrepancies, if any, identified by Purchaser during such Provisional Inspection." See Agreement § 3.3. (Exhibit A at 6)

19.     In accordance with the Agreement, ATS performed the provisional inspection of the Aircraft. It met with ATS's approval and ATS signed the Provisional Acceptance Letter on March 11, 2008. See Provisional Acceptance Letter, dated March 11, 2008. (Exhibit B)

20.     SOCPROP accepted the Provisional Acceptance Letter from ATS and sent ATS a signed copy of the letter. At this point, pursuant to the Agreement, the escrow deposit of $3,000,000 became "non-refundable." See Agreement § 3.4. (Exhibit A at 6). Therefore ATS could no longer seek a refund of its deposit from I.A.T.S.

21. Pursuant to the Agreement, once SOCPROP had repaired any defects that ATS identified in its Provisional Acceptance Letter, ATS then had an opportunity to conduct a final inspection of the Aircraft. This inspection was to occur "[w]ithin two business days following written confirmation to the Purchaser, from the Seller, that any and all Discrepancies identified in the Provisional Acceptance Letter ... have been repaired or rectified and that the Aircraft is ready for inspection at the Delivery Location." See Agreement § 3.5. (Exhibit A at 6) The Delivery Location was defined in the Agreement as "a location to be reasonably specified by the Purchaser and reasonably acceptable to the Seller." See Agreement § 1.1. (Exhibit A at 3)

22. ATS also could undertake "an additional test flight of the Aircraft of no more than one (1) hour in duration", within two business days of written receipt that the discrepancies outlined in the Provisional Acceptance Letter had been repaired or rectified. See Agreement § 3.5. (Exhibit A at 6)

23. Immediately upon successful completion of its final inspection and additional test flight, if any, ATS was required to sign the Final Acceptance Letter wherein it accepted the Aircraft. See Agreement § 3.5. (Exhibit A at 6) Upon ATS's acceptance of the Aircraft, both parties were required to satisfy their closing obligations. See Agreement §§ 4.2.2; 4.3.1; 4.3.2 (Exhibit A at 6, 7)

24. Importantly, the Agreement did not include a specific date for closing to occur. Rather, the Agreement stated that "the Closing shall occur within a maximum period of three (3) Business Days after Seller's notice to Purchaser that the Aircraft has been transported to the Delivery Location, which is anticipated to be on or about July 1, 2008." See Agreement § 4.1. (Exhibit A at 6) (emphasis added)

SOCPROP and ATS Agree to Delay the Closing Date

25.     SOCPROP had entered into a contract with Bombardier for purchase of a new Global Express XRS Jet aircraft (the "XRS Jet") – to be delivered in the summer of 2008. ATS was aware of this contract between Bombardier and SOCPROP.

26.     In June 2008, Bombardier informed SOCPROP that there would be a delay in the delivery of its replacement plane -- the XRS Jet.  SOCPROP made ATS aware of the new delivery date of its XRS Jet from Bombardier.  SOCPROP and ATS therefore signed an Aircraft Purchase and Sale Agreement Amendment Agreement (the "Amendment") on June 23, 2008 -- which amended the original closing date, stating that "[t]he Closing shall occur within a maximum period of three (3) Business Days after Seller's notice to Purchaser that the Aircraft has been transported to the Delivery Location, which is anticipated to be during September 2008." See Amendment § 4.1. (Exhibit C at 1)  (emphasis added).  The Amendment did not identify a specific date for closing.

27.     Several months later, Bombardier notified SOCPROP that delivery of the XRS Jet would be further delayed. Bombardier then communicated directly with ATS regarding the ATS/SOCPROP Agreement, and ATS agreed to further extend the anticipated closing date for delivery of the Aircraft to at least October 2008.  In short, ATS and Bombardier agreed  -- and informed SOCPROP -- that they would coordinate the delivery of the Aircraft from SOCPROP to ATS, with the delivery of the XRS Jet from Bombardier to SOCPROP.

28.     On September 17, 2008, SOCPROP informed ATS that the Aircraft was due for maintenance, which SOCPROP proposed to complete in Montreal, Canada.  This required maintenance would take three to four weeks.

29.     Out of the blue -- on October 1 -- ATS sent SOCPROP a Notice of Default, claiming that unless SOCPROP complied with all conditions of closing within ten business days following receipt of the notice, ATS would terminate the Agreement. ATS further warned that it would seek a return of the escrow deposit in the event that it terminated the Agreement; this clearly was in violation of the Agreement, which provided that the escrow deposit already was non-refundable.

30.     SOCPROP responded to ATS's Notice of Default on October 2, 2008, informing ATS that the Aircraft was available for delivery and asked ATS to confirm a time and place for delivery.

31.     ATS responded by demanding that delivery occur within ten days of SOCPROP's receipt of the October 1, 2008 Notice of Default – despite the fact that ATS knew that the required maintenance would take three to four weeks.

32.     On October 10, 2008 SOCPROP yet again informed ATS that the Aircraft was available for delivery and stated that no breach of the Agreement had occurred, and thus no right to terminate the Agreement had arisen. ATS then unilaterally alleged that SOCPROP had until October 15 to deliver the Aircraft to ATS, offering no justification for this unilateral drop-dead date.

33.     SOCPROP wrote to ATS on October 13, 2008 to suggest (as it had on September 17), that the Aircraft's flight from Europe to the maintenance facility in Montreal on October 15 could serve as ATS's optional test flight. SOCPROP noted that the discrepancies identified by ATS were scheduled for rectification at the maintenance facility.

34.     ATS ignored SOCPROP's letter. Instead, on October 15, 2008, ATS served SOCPROP with a Notice of Termination, giving SOCPROP until 5:00 PM EST that same

49. SOCPROP is entitled to recover damages from ATS in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING)**

50. SOCPROP repeats and realleges each of the foregoing paragraphs of the Complaint as if fully alleged herein.

51. The Agreement between SOCPROP and ATS is a valid and binding contract containing an implied covenant of good faith and fair dealing.

52. In breach of its contractual obligations, ATS has acted in bad faith in its dealings with SOCPROP concerning its refusal to purchase and accept delivery of the Aircraft.

53. As a result of ATS's conduct, SOCPROP has suffered damages in an amount to be determined at trial.

WHEREFORE, SOCPROP demands judgment as follows:

(i) Awarding SOCPROP damages, in an amount to be determined at trial;

(ii) Awarding SOCPROP costs and disbursements, including its reasonable attorneys' fees, incurred in this action as a matter of law and pursuant to the Agreement; and

(iii) Granting SOCPROP such other, further or different relief as the Court may deem just and proper.

# Exhibit A

**AIRCRAFT PURCHASE AND SALE AGREEMENT**

**Dated as of the 6th day of March, 2008,**

**between**

**SOCPROP SARL,**

**as Seller,**

**and**

**AERO TOY STORE, LLC,**

**as Purchaser,**

**concerning one Global Express Jet Aircraft**

**bearing**

**Manufacturer's Serial Number 9076**

**and**

**Luxembourg Registration Number LX-VIP**

# AIRCRAFT PURCHASE AND SALE AGREEMENT

This **AIRCRAFT PURCHASE AND SALE AGREEMENT** (this "Agreement") is being made and entered into as of the ____ day of March, 2008, by and between **SOCPROP SARL**, (a private company with limited liability *(société à responsabilité limitée)* organised under the laws of Luxembourg, having an office c/o Fortis Intertrust, 65 Boulevard, Grand Duchess Charlotte, L-1331 Luxembourg, as Seller (the "Seller"), and **AERO TOY STORE, LLC**, a Florida limited liability company having an office at 1710 West Cypress Creek Road, Ft. Lauderdale, Florida 33309, or its assignee or designee, as Purchaser (the "Purchaser").

**WITNESSETH:**

**WHEREAS**, Seller is the Owner of the Aircraft described and referred to hereinbelow; and

**WHEREAS**, Purchaser desires to purchase the Aircraft from Seller, and Seller desires to sell the Aircraft to Purchaser, all upon and subject to the terms, provisions and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I. DEFINITIONS

1.1 The following terms shall have the following meanings for all purposes of this Agreement:

**"Aircraft"** means that certain Bombardier Global Express jet aircraft bearing Manufacturer's Serial Number 9076 (the "Airframe"), together with two (2) Rolls Royce Model BR700-A2-20 jet engines bearing Manufacturer's Serial Numbers 12269 and 12268 (collectively, the "Engines") and all appurtenances, avionics, parts, appliances, instruments, components, accessions, furnishings, and other equipment attached thereto or incorporated therein as of the Closing, all as more particularly described in the Aircraft Documents, and all Miscellaneous Items and Aircraft Documents.

**"Aircraft Documents"** means a current and valid Export Certificate of Airworthiness to be issued by the DCAL in favor of the United States, the Deregistration Certificate, and complete and consecutive Airframe, Engine and accessory logbooks (original and in English), flight records, weight and balance manuals, overhaul records, wiring diagrams, checklists, maintenance manuals and records, and any other miscellaneous documents and/or paperwork that pertain to the ownership, operation and/or history of the Aircraft, to the extent the same are in Seller's possession and/or control.

**"Balance of the Purchase Price"** means the amount of Forty-Two Million and No/100 United States Dollars (US$42,000,000.00).

**"Business Day"** means any day of the year in which banks are not authorized or required to close for business in England and/or Luxembourg and/or in the States of Florida and/or Oklahoma.

**"Cancellation Event"** means the notification to the Purchaser by the Seller that the Discrepancies identified in the Provisional Acceptance Certificate would be onerous in terms of time or expense to correct and that the provisions of Section 3.4 hereof shall apply.

**"Cape Town Treaty"** means, collectively, the Convention on International Interests in Mobile Equipment, the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, the Regulations for the International Registry, and the International Registry Procedures, together with all other rules, amendments, supplements, and revisions thereto.

**"Closing"** means the consummation of the purchase and sale transaction contemplated by this Agreement.

**"Closing Date"** has the meaning ascribed to the term in Section 4.1 hereof.

**"DCAL"** means the Directorate of Civil Aviation of Luxembourg.

**"Delivery Location"** means a location to be reasonably specified by the Purchaser and reasonably acceptable to the Seller.

**"Delivery Receipt"** means an Aircraft Delivery Receipt in the form of Exhibit D attached hereto.

**"Deposit"** means a purchase money deposit in the amount of Three Million and No/100 United States Dollars (US$3,000,000.00), together with any interest that accrues thereon.

**"Deregistration Certificate"** means a letter from the DCAL confirming that the Aircraft has been deregistered from the Civil Aviation Registry of Luxembourg.

**"Discrepancy"** means any item discovered during Purchaser's Provisional Inspection and/or Final Inspection and/or test flights of the Aircraft that must be corrected in order for the Aircraft to be in the condition required by Section 3.1 hereof.

**"Escrow Agent"** means Insured Aircraft Title Services, Inc., 4848 S.W. 36th Street, Oklahoma City, Oklahoma 73179; Tel. No.: 405-681-6663; Fax No.: 405-681-9299.

**"Escrow and Title Search Fee"** means the fees to be charged by the Escrow Agent for searching the title to the Aircraft and acting as escrow agent.

**"FAA"** means the Federal Aviation Administration.

**"FAA Civil Aviation Registry"** means the FAA Civil Aviation Registry, Aircraft Registration Branch, Mike Monroney Aeronautical Center, 6500 South MacArthur Boulevard, Oklahoma City, Oklahoma 73169.

**"Final Acceptance Letter"** means a Final Acceptance Letter in the form of Exhibit C attached hereto.

**"International Registry"** means the International Registry of Mobile Assets established pursuant to the Cape Town Treaty.

RL
KW

**"Lien"** means any lien, mortgage, security interest, lease or other charge or encumbrance of others including, without limitation, rights of others under any airframe, engine, APU, avionics, or parts interchange, loan, lease or pooling agreement.

**"Lien Holder"** means any person, corporation, limited liability company or other entity possessing a Lien against the Aircraft.

**"Lien Release"** means a document which, when filed in the Luxembourg Civil Aviation Registry, will cause a recorded Lien affecting the Aircraft to be terminated and released.

**"Miscellaneous Items"** means all spare parts, engine covers, ground equipment, loose equipment, toolkits and galley furnishings used exclusively in connection with the operation of the Aircraft, to the extent the same are in Seller's possession and/or control as of the Closing.

**"Provisional Acceptance"** means the provision by the Purchaser to the Seller of the Provisional Acceptance Letter.

**"Provisional Acceptance Letter"** means a Provisional Acceptance Letter in the form of Exhibit B annexed hereto.

**"Provisional Inspection"** has the meanings ascribed to the term in Section 3.2 hereof.

**"Provisional Inspection Facility"** has the meaning ascribed to the term in Section 3.2 hereof.

**"Professional User Entity"** has the meaning ascribed to the term in Section 2.1.6 of the Registry Regulations.

**"Purchase Price"** means the amount of Forty-Five Million and No/100 United States Dollars (US$45,000,000.00).

**"Registry Regulations"** means the Regulations for the International Registry, which may be obtained online through the International Registry's website at: www.internationalregistry.aero.

**"Transacting User Entity"** has the meaning ascribed to the term in Section 2.1.11 of the Registry Regulations.

**"Warranty Bill of Sale"** means a Warranty Bill of Sale in the form of Exhibit E attached hereto.

## ARTICLE II. AGREEMENT TO BUY AND SELL

2.1 **Agreement.** For and in consideration of the Purchase Price, on the Closing Date, Seller shall sell and deliver to Purchaser, and Purchaser shall purchase and accept delivery from Seller of, the Aircraft, on and subject to the terms and conditions set forth herein.

2.2 **Deposit.** As of the date hereof, the Purchaser has paid the Deposit to the Escrow Agent, which shall be held by the Escrow Agent, shall be disbursed in accordance with the provisions of this Agreement, and upon the Purchaser's Provisional Acceptance of the Aircraft, shall become non-refundable to Purchaser, subject to Seller's timely compliance with its obligations hereunder.

## ARTICLE III. AIRCRAFT CONDITION AND INSPECTION

3.1 **Aircraft Condition.** The Aircraft shall be delivered to Purchaser on the Closing Date in the following condition:

3.1.1 with no Liens;

3.1.2 with all applicable Airworthiness Directives issued by the DCAL and/or FAA and/or all other governmental authorities having jurisdiction, and all Mandatory Service Bulletins issued by any of the manufacturers (in each case, with respect to any component of the Aircraft) complied with and current to date, and all systems functioning properly;

3.1.3 with all Airframe and Engine inspections current to date, as per each manufacturer's recommended maintenance schedule;

3.1.4 with all Airframe, Engines, APU and avionics maintenance programs and contracts, if any, paid to date;

3.1.5 with no material damage history (i.e., requiring the filing of FAA Form 337);

3.1.6 with no more than three hundred (300) hours of additional usage (between the date hereof and the Closing);

3.1.7 with all Aircraft Documents; and

3.1.8 with all Miscellaneous Items.

3.2 **Provisional Inspection.** Purchaser and/or its representatives shall be permitted (at the Purchaser's own cost) to conduct: (i) a review of the Aircraft Documents at Seller's facility located in Luxembourg, during the period March 3-7, 2008; and (ii) an inspection (the "Provisional Inspection") of the Aircraft, the scope of which shall be as reasonably specified by Purchaser and may include a test flight of up to one and a half (1.5) hours in duration, at either Global Jet Center, Luxemburg, or Farnborough Airport, England, as the parties may agree (the "Provisional Inspection Facility"), such Provisional Inspection to be: (x) commenced (by the Purchaser), on or about March 8, 2008 (subject to the Aircraft then being positioned at the Provisional Inspection Facility); and (y) completed (by the Purchaser), within a maximum period of five (5) Business Days thereafter.

3.3 **Provisional Acceptance.** As soon as is reasonably possible after Purchaser's conclusion of its Provisional Inspection of the Aircraft and in any case not later than 20th March 2008, Purchaser shall either reject the Aircraft by notice to the Seller (in which event, the Deposit shall be forthwith refunded to the Purchaser, in full), or execute and deliver to the Seller the Provisional Acceptance Letter, together with the Addendum thereto, which shall contain a description of all Discrepancies, if any, identified by Purchaser during such Provisional Inspection. With respect to the foregoing, it is understood that Purchaser's failure to timely execute and deliver said Provisional Acceptance Letter or notice of rejection, shall automatically be deemed to constitute Purchaser's rejection of the Aircraft.

3.4 Within a maximum period of three (3) Business Days after Seller's receipt of the Provisional Acceptance Letter, Seller may either: (i) terminate this Agreement by written notice to Purchaser and the Escrow Agent, whereupon the Deposit shall forthwith be refunded to Purchaser, in full, subject to the provisions of Section 4.4.3 hereof, together with all fees, costs and/or expenses reasonably incurred by Purchaser in inspecting the Aircraft; provided, however, that the Seller shall have no other liability in respect of such termination and the Purchaser waives any other remedies that may be available to the Purchaser, at law or in equity, as a consequence thereof; or (ii) accept the Provisional Acceptance Letter by signing and forwarding to Purchaser a copy thereof, whereupon the Deposit shall become non-refundable (subject to Seller's timely compliance with its obligations hereunder).

3.5 **Final Acceptance Letter.** Within two Business Days following written confirmation to the Purchaser, from the Seller, that any and all Discrepancies identified in the Provisional Acceptance Letter (and/or during the ferry flight of the Aircraft to the Delivery Location) have been repaired or rectified and that the Aircraft is ready for inspection at the Delivery Location, Purchaser shall be permitted, at its own cost, to conduct a final inspection of the Aircraft (which, if required, may include an additional test flight of the Aircraft of no more than one (1) hour in duration; hereinafter, the "Final Inspection") immediately after which it shall sign the Final Acceptance Letter verifying that Purchaser has confirmed that all Discrepancies have been corrected (provided such Final Inspection was satisfactory or, in the event additional Discrepancies are discovered during such Final Inspection, subject to the repair or remedy of the same), and that the Purchaser accepts the Aircraft.

## ARTICLE IV. PRE-CLOSING DELIVERIES; CLOSING PROCEDURES

4.1 **Closing Date.** The Closing shall occur within a maximum period of three (3) Business Days after Seller's notice to Purchaser that the Aircraft has been transported to the Delivery Location, which is anticipated to be on or about July 1, 2008.

4.2 **Pre-Closing Obligations.**

4.2.1 Prior to the Closing, Purchaser shall pay the Balance of the Purchase Price, plus one-half (½) of the Escrow and Title Search Fee, to the Escrow Agent.

4.2.2 Prior to the Closing, Seller shall deliver to the Escrow Agent:

4.2.2.1 an undated, but otherwise fully executed, DCAL Bill of Sale;

4.2.2.2 an undated, but otherwise fully executed, Warranty Bill of Sale;

4.2.2.3 the Deregistration Certificate; and

RL
LW

4.2.2.4 fully executed and recorded (in the DCAL) Lien Releases from all Lien Holder's having a Lien on the Aircraft

4.2.3 Prior to the Closing, Seller shall have positioned the Aircraft at the Delivery Location.

4.3 **Closing**. On the Closing Date, the parties shall perform the following actions, all of which shall be accomplished simultaneously and, collectively, shall constitute the Closing:

4.3.1 Seller shall:

4.3.1.1 deliver the Aircraft to Purchaser at the Delivery Location in the condition required by Section 3.1 hereof, together with its Export Certificate of Airworthiness;

4.3.1.2 instruct the Escrow Agent to date and release to Purchaser the Warranty Bill of Sale, together with the Deregistration Certificate; and

4.3.1.3 instruct the Escrow Agent to date the DCAL Bill of Sale and release to Purchaser.

4.3.2 Purchaser shall:

4.3.2.1 accept delivery of the Aircraft from Seller at the Delivery Location, provided the same is in the condition required by Section 3.1 hereof;

4.3.2.2 deliver to Seller a fully executed Delivery Receipt; and

4.3.2.3 instruct the Escrow Agent to release to Seller the Purchase Price.

4.4 **International Registry Matters.**

4.4.1 If applicable, as soon as reasonably practicable after the execution of this Agreement, Seller shall apply to the International Registry for approval as a Transacting User Entity; and, provided such approval shall have been received at or after the Closing, Seller shall either provide its consent, or shall designate the Escrow Agent as Seller's Professional User Entity for the purpose of providing consent to the registration, by Purchaser, of this Agreement evidencing the transfer of title to the Aircraft to Purchaser. Purchaser shall be solely responsible for all fees, costs and expenses of the registration of this Agreement with the International Registry, excluding only the fees for Seller to register as a Transacting User Entity, which shall be borne by Seller.

4.4.2 Purchaser shall have no right to, and hereby agrees that it will not, register, consent to or allow any third party to register any contract of sale, prospective contract of sale, international interest or prospective international interest under the Cape Town Treaty with respect to the Airframe or the Engines, until after the Closing has been completed in accordance with the provisions of Section 4.3 hereof and title to the Aircraft has been conveyed to Purchaser.

RJ
KW

4.4.3 Notwithstanding anything in this Agreement to the contrary, Purchaser and the Escrow Agent hereby agree that in the event of the termination of this Agreement for any reason whatsoever (which termination shall, in no event, be effective until the requirements of this Section 4.4.3 have been satisfied), the Escrow Agent shall not return the Deposit to Purchaser, and Seller shall have no obligation to pay Purchaser any amounts due to Purchaser by reason of such termination, whether pursuant to Section 7.4.1 or otherwise, unless and until the Escrow Agent has searched the International Registry and determined that no contract of sale, prospective contract of sale, international interest or prospective international interest has been filed or registered against any portion or all of the Aircraft by Purchaser or any person claiming by, through, under or in connection with Purchaser. Each party shall bear one-half of all costs and expenses to search the International Registry database pursuant to this Section 4.4.3, unless this Agreement terminates as a result of a breach or default by one of the parties hereto, in which event the party in breach or default shall pay all such costs.

4.4.4 In the event that any contract of sale, prospective contract of sale, international interest or prospective international interest has been filed or registered against the Aircraft by Purchaser or any person claiming by, through, under or in connection with Purchaser in breach of Section 4.4.2 above, Purchaser shall discharge or cause the discharge of any such filing or registration immediately after written notice from Seller or the Escrow Agent to Purchaser. Purchaser agrees that Seller shall have all of the rights available to it under law or in equity, including the right of specific performance, to enforce Purchaser's performance of its obligations hereunder. Notwithstanding anything in this Agreement to the contrary, Purchaser agrees to be responsible for and, upon demand, to defend, indemnify and hold Seller harmless from and against any and all claims, demands, liabilities, damages, losses and judgments (including legal fees and all expenses) arising out of any breach by Purchaser of any of its obligations under this Section 4.4, it being specifically understood that this indemnity obligation shall survive the termination of this Agreement, for any reason, as well as the Closing.

## ARTICLE V. REPRESENTATIONS AND WARRANTIES

5.1 **Seller's Representations and Warranties.** Seller hereby represents and warrants as follows:

5.1.1 Seller is a limited liability company, duly incorporated and validly existing under the laws of Luxembourg,, with the power to own its assets and carry on its business as it is being conducted and to execute, deliver and perform the provisions of this Agreement.

5.1.2 The execution, delivery, and performance by Seller of this Agreement, including the sale of the Aircraft to Purchaser, have been duly authorized by all necessary action on behalf of Seller and do not conflict with, or will result in any breach of, any of the terms or constitute a default under any document, instrument, or agreement to which Seller is a party.

5.1.3 The person executing this Agreement on behalf of Seller has full power and authority to do so.

5.1.4 This Agreement constitutes the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited

by applicable bankruptcy and/or insolvency laws and/or the rights of creditors generally (the "Enforceability Exceptions").

5.1.5 At the time of the Closing, Seller shall convey to Purchaser good and marketable title to the Aircraft, free and clear of all Liens.

5.2 **Purchaser's Representations and Warranties.** Purchaser hereby represents and warrants as follows:

5.2.1 Purchaser is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Florida, possessing perpetual existence as a legal entity, having the capacity to sue and be sued in its own name, having full power, legal right and authority to carry on its business as currently conducted, and to execute, deliver and perform the provisions of this Agreement.

5.2.2 The execution, delivery, and performance by Purchaser of this Agreement, including the acquisition of the Aircraft by Purchaser, have been duly authorized by all necessary action on behalf of Purchaser and do not conflict with, or will result in any breach of, any of the terms or constitute a default under any document, instrument, or agreement to which Purchaser is a party.

5.2.3 The person executing this Agreement on behalf of Purchaser has full power and authority to do so.

5.2.4 This Agreement constitutes the legal, valid and binding obligations of Purchaser and is enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions.

## ARTICLE VI. DISCLAIMER

6.1 **DISCLAIMER AND LIMITATION OF LIABILITY.** PURCHASER ACKNOWLEDGES THAT THE AIRCRAFT IS BEING SOLD AND DELIVERED TO PURCHASER IN "AS-IS, WHERE-IS, AND WITH ALL FAULTS" CONDITION, AND THAT ALL DELIVERY CONDITIONS SPECIFIED IN THIS AGREEMENT SHALL EXPIRE AND BE OF NO FURTHER FORCE OR EFFECT AS OF THE CLOSING. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND/OR IN THE WARRANTY BILL OF SALE, SELLER DOES NOT MAKE, GIVE OR EXTEND, AND PURCHASER HEREBY DISCLAIMS AND RENOUNCES, ANY AND ALL OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, WHETHER ARISING IN LAW, IN EQUITY, IN CONTRACT OR IN TORT INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, AIRWORTHINESS, DESIGN, CONDITION, OR FITNESS FOR A PARTICULAR USE, PURCHASER HEREBY CONFIRMING THAT IT IS NOT RELYING UPON ANY OTHER REPRESENTATION, STATEMENT OR OTHER ASSERTION WITH RESPECT TO THE AIRCRAFT.

## ARTICLE VII. MISCELLANEOUS

7.1 **Taxes.** Purchaser shall be responsible for, shall defend, indemnify and hold harmless Seller from and against, and shall pay promptly when due, any and all sales and/or use taxes to become due in or to the United States, as a result of the sale or delivery of the Aircraft to Purchaser.

7.2 **Manufacturers' Warranties.** By its execution hereof, the Seller hereby assigns to the Purchaser, effective as of the Closing, the benefit of all manufactures' warranties and/or guaranties applicable to the Aircraft.

7.3 **Risk of Loss.** Seller shall bear all risk of loss, damage or destruction of the Aircraft occurring prior to the Closing, and Purchaser shall bear all risk of loss, damage or destruction of the Aircraft occurring subsequent to the Closing. Notwithstanding any contrary provision of this Agreement, if at any time prior to the Closing the Aircraft is destroyed or materially damaged, this Agreement shall terminate, and the Escrow Agent shall refund the Deposit to Purchaser, after which neither party shall have any further obligations (to the other) hereunder.

7.4 **Defaults.**

7.4.1 **Seller's Default.** In the event Seller fails to deliver the Aircraft to Purchaser in violation of the terms and conditions of this Agreement, and provided Purchaser is not then in breach or default in timely performing its obligations under this Agreement, Purchaser shall, if such violation is not cured within ten Business Days of notice thereof from the Purchaser, have the right to terminate this Agreement by written notice to Seller and Escrow Agent; and, in such event, the Deposit shall forthwith be refunded to Purchaser, subject to the provisions of Section 4.4.3 hereof, together with all fees, costs and/or expenses reasonably incurred by Purchaser in inspecting the Aircraft, it being understood that the Seller shall have no other liability in respect of such termination and the Purchaser waives any other remedies that may be available to the Purchaser, at law or in equity, as a consequence thereof.

7.4.2 **Purchaser's Default.** In the event Purchaser fails to accept delivery of the Aircraft and pay the Purchase Price to Seller in violation of the terms and conditions of this Agreement, and provided Seller is not then in breach or default in timely performing its obligations hereunder, Seller shall have the right, after ten (10) Business Days' prior written notice from Seller of such breach or default and Purchaser's failure to cure (or commence curing) the same with such 10-day period, to terminate this Agreement by written notice to Purchaser and the Escrow Agent. If Seller elects to terminate this Agreement pursuant to this Section 7.4.2, the Escrow Agent shall pay the Deposit to Seller as liquidated damages, and this Agreement shall be of no further force or effect. Seller acknowledges and represents that the liquidated damages amount provided for in this Section 7.4.2 is a reasonable estimate of the damages that would be incurred by Seller in the event Purchaser defaults on Purchaser's obligations under this Agreement. Seller's rights to receive the Deposit as liquidated damages, and Seller's rights under Section 4.4, shall be cumulative and not alternative, and shall be the sole remedies available to Seller in the event Purchaser defaults on Purchaser's obligations under this Agreement; and Seller waives any other remedies that may be available to Seller, at law or in equity, as a consequence thereof.

7.5 **Amendments.** The provisions of this Agreement may not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever, except by a written instrument signed by both parties hereto.



7.6 **Severability.** Any provision of this Agreement that may be determined, by any United States' authority having jurisdiction over the parties hereto, to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any U.S. jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7.7 **Successors and Assigns.** This Agreement shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns.

7.8 **Headings and References.** The division of this Agreement into sections, and the insertion of headings, are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

7.9 **Counterparts.** This Agreement may be fully executed in two (2) or more separate counterparts by each of the parties hereto, all such counterparts together constituting but one and the same instrument. Such counterparts may be exchanged via facsimile transmission provided that immediately following such transmission, each party shall forward an executed original copy of the counterpart to the other party by first class mail or courier.

7.10 **Notices.** All communications, declarations, demands, consents, directions, approvals, instructions, requests and notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given or made when delivered personally or transmitted electronically by facsimile, receipt acknowledged, or in the case of documented overnight delivery service or registered or certified mail, return receipt requested, delivery charge or postage prepaid, on the date shown on the receipt therefore, in each case at the respective addresses set forth below:

| | | |
|---|---|---|
| If to Seller: | SOCPROP SARL<br>c/o Fortis Intertrust<br>65 Boulevard Grand Duchess Charlotte<br>L-1331 Luxembourg<br>Attn: Cornelius Bechtel, Manager | Tel: +352 26 449 1<br>Fax: +352 26 449 900<br>Email: Cornelius.Bechtel@fortisintertrust.com |
| If to Purchaser: | Aero Toy Store, LLC<br>1710 West Cypress Creek Rd.<br>Fort Lauderdale, FL 33309<br>Attn: Richard Laggan,<br>Vice President and CFO | Tel: 954-771-1795<br>Fax: 954-771-3281<br>Email: richl@aerotoystore.com |
| With a Copy To: | Aero Toy Store, LLC<br>1710 West Cypress Creek Rd.<br>Fort Lauderdale, FL 33309<br>Attn: General Counsel | Tel: 954-771-1795<br>Fax: 954-771-3281<br>Email: joes@aerotoystore.com |
| If to Escrow Agent: | Insured Aircraft<br>Title Service, Inc.<br>4848 S.W. 36th Street<br>Oklahoma City, OK 73179<br>Attn: Kirk Woford | Tel: 405-681-6663<br>Fax: 405-681-9299<br>Email: kwoford@insuredaircraft.com |

AL
KW

Seller shall provide to Purchaser a copy of all communications, declarations, demands, consents, directions, approvals, instructions, requests and notices sent by Seller to Escrow Agent, and Purchaser shall provide to Seller a copy of all communications, declarations, demands, consents, directions, approvals, instructions, requests and notices sent by Purchaser to Escrow Agent.

7.11 **Attorneys' Fees.** In the event it becomes necessary to enforce the terms of this Agreement by litigation or otherwise, the prevailing party shall be entitled to recover its reasonable attorneys' fees and court costs, including any such fees or costs arising from subsequent appeals and efforts to execute on any judgment.

7.12 **Non-Waiver.** Any failure, at any time, of either party to enforce any provision of this Agreement shall not constitute a waiver of such provision or prejudice the right of such party to enforce such provision at any subsequent time.

7.13 **Entire Agreement.** The parties agree that the terms and conditions of this Agreement constitute the entire agreement between the parties. This Agreement supersedes all prior understandings and/or agreements between the parties, express or implied.

7.14 **Transaction Costs and Expenses.** Each party to this Agreement shall bear its own transaction costs and expenses including, without limitation, any brokers' commissions and/or attorneys' fees.

7.15 **Brokers Fees and Expenses.** Seller agrees to be responsible for, and to defend, indemnify and hold Purchaser harmless from and against, any claims made by any broker or other party claiming an interest in the Aircraft or the Purchase Price arising from an actual or alleged relationship or agreement with Seller; and Purchaser agrees to be responsible for, and to defend, indemnify and hold Seller harmless from and against any claims made by any broker or other party claiming an interest in the Aircraft or the Purchase Price arising from an actual or alleged relationship or agreement with Purchaser.

7.16 **Confidentiality.** The terms and conditions of this Agreement, and all writings, discussions, and negotiations in connection with the transactions contemplated by this Agreement (including, without limitation, the fact that discussions and negotiations have been conducted by the parties), shall remain strictly confidential and shall not be disclosed by either party, without the prior written consent of the other party, except that each party shall be entitled to disclose the terms and conditions of this Agreement to such party's attorneys, accountants, consultant, and other advisors performing services for such party with respect to, or affected by, the transactions contemplated by this Agreement.

7.17 **Force Majeure.** Neither party shall be liable to the other as a result of any failure of, or delay in the performance of, its obligations hereunder, for the period that such failure or delay is due to: Acts of God or the public enemy; war, insurrection or riots; fires; governmental actions; strikes or labor disputes; inability to obtain aircraft materials, accessories, equipment or parts from vendors; or any other cause beyond Seller's reasonable control. Upon the occurrence of any such event, the time required for performance by such party of its obligations arising under this Agreement, shall be extended by a period equal to the duration of such event.

7.18 **Agreement Negotiated.** The parties to this Agreement are sophisticated and have been represented or had the opportunity to be represented by counsel in connection with the negotiation and performance of this Agreement. The parties agree that no presumptions relating

to the interpretation of contracts against the drafter of any particular clause should or may be applied in this case and, therefore, each party waives their effects.

7.19 **Governing Law.** This Agreement has been negotiated and delivered in the State of New York and shall, in all respects, be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

7.20 **Jurisdiction and Venue.** Exclusive jurisdiction and venue over any and all disputes between the parties arising under this Agreement shall be in, and for such purpose each party hereby submits to the exclusive jurisdiction of, the state and federal courts serving the State of New York, Borough of Manhatten, the City of New York.

***(Signature Page Follows)***

**IN WITNESS WHEREOF**, the undersigned parties have caused this **Aircraft Purchase Agreement** to be duly executed, delivered and effective as of the date first above written.

**Seller:**

**SOCPROP SARL**

By:
Print: Cornelius Bechtel
Title: Manager

**Purchaser:**

**AERO TOY STORE, LLC**

By: Richard Laggan
Print: Richard Laggan
Title: Vice President and CFO

**CONSENT AND JOINDER**

Purchaser and Seller hereby appoint the Escrow Agent as document holder and stakeholder for the sale and purchase of the Aircraft, and the Escrow Agent accepts such appointment for and in consideration of the Escrow and Title Search Fee. The parties acknowledge that the Escrow Agent is acting as a document holder and stakeholder, only, its duties being purely ministerial, at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent or trustee for either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any act or omission unless it involves willful misconduct or gross negligence on its part. Purchaser and Seller shall each pay one-half (½) of the Escrow and Title Search Fee.

The undersigned does hereby consent to and join in the foregoing Agreement, hereby agreeing to act as Escrow Agent in accordance with the provisions of the Agreement applicable to the Escrow Agent.

**Insured Aircraft Title Service, Inc.**

By: ____________________
Kirk Woford, President

BK-#8336092-FINAL-PA

RL
KW

**EXHIBIT A**

**[INTENTIONALLY OMITTED]**

**EXHIBIT B**

**PROVISIONAL ACCEPTANCE LETTER**

**DATE:** ____________________, 2008

**TO:** SOCPROP SARL
c/o Fortis Intertrust
65 Boulevard Grand Duchess of Charlotte
L-1331 Luxembourg
Attn: Cornelius Bechtel, Manager

**RE: Completion of Provisional Inspection**

Dear Sir/Madam:

Pursuant to that certain Aircraft Purchase Agreement (the "Agreement"), dated as of the _____ day of March, 2008, by and between SOCPROP SARL ("Seller") and Aero Toy Store, LLC ("Purchaser"), pertaining to that certain Bombardier Global Express jet aircraft bearing Manufacturer's Serial Number 9076 and Luxembourg Registration No. LX-VIP, this letter confirms that Purchaser has completed its Provisional Inspection of the Aircraft (as said term is defined in Section 3.2 of the Agreement) and

_____ hereby rejects the same

_____ has found the same to be satisfactory, except for those Discrepancies noted on the Addendum annexed hereto as Schedule I, and except for any additional Discrepancies discovered during Purchaser's Final Inspection of the Aircraft (as said terms are defined in the Agreement).

Sincerely,

AERO TOY STORE, LLC

By: ______________________________
Print:
Title:

AGREED TO AND ACCEPTED BY:

SOCPROP SARL

By: ______________________________
Print: Cornelius Bechtel
Title: Manager

BK-#8336092-FINAL-PA

**SCHEDULE I**

**ADDENDUM TO**
**PROVISIONAL ACCEPTANCE LETTER**

**DISCREPANCIES**

1.

2.

3.

4.

5.

BK-#8336092-FINAL-PA

16

**EXHIBIT C**

**FINAL ACCEPTANCE LETTER**

**DATE:** ____________________, 2008

**TO:** SOCPROP SARL
c/o Fortis Intertrust
65 Boulevard Grand Duchess of Charlotte
L-1331 Luxembourg
Attn: Cornelius Bechtel, Manager

**RE:** Bombardier Global Express
Luxembourg Registration No. LX-VIP
Serial Number 9076

Dear Sir/Madam:

Pursuant to that certain Aircraft Purchase Agreement (the "Agreement"), dated as of the _____ day of March, 2008, by and between SOCPROP SARL ("Seller") and Aero Toy Store, LLC ("Purchaser"), pertaining to the above referenced Aircraft, this letter confirms that Purchaser has completed its Final Inspection of the Aircraft (as said term is defined in the Agreement), has found the same to be satisfactory and hereby accepts such Aircraft in accordance with the terms of the Agreement.

Sincerely,

AERO TOY STORE, LLC

By: ______________________________
Print:
Title:

BK-#8336092-FINAL-PA

**EXHIBIT D**

**AIRCRAFT DELIVERY RECEIPT**

**Aero Toy Store, LLC** ("Purchaser"), hereby acknowledges irrevocable acceptance of the Aircraft and the Aircraft Documents described and referred to herein, from **SOCPROP SARL** ("Seller"), at _______ o'clock (am / pm) on the ___ day of _______________, 2008, at _________________, _________________.

> "**Aircraft**" means that certain Bombardier Global Express jet aircraft, bearing Manufacturer's Serial Number 9076, together with two (2) Rolls Royce, Model BR700-A2-20 jet engines bearing Manufacturer's Serial Numbers 12269 and 12268, and all spare parts, ground equipment, loose equipment, galley furnishings, appurtenances, appliances, instruments, components, accessions, furnishings and other equipment attached thereto or incorporated therein, or that is in Seller's possession and/or control, and all Aircraft Documents.

> "**Aircraft Documents**" means all airframe, engine, and accessory logbooks, manuals, and maintenance records relating to the Aircraft that are in Seller's possession and/or control, together with a current and valid DCAL Export Certificate of Airworthiness in favor of the United States.

TOTAL TIME OF AIRFRAME AT DELIVERY: hours

TOTAL TIME OF ENGINES AT DELIVERY:
Left Engine: hours
Right Engine: hours

TOTAL LANDINGS AT DELIVERY:

Purchaser irrevocably acknowledges and agrees that the Aircraft has been delivered to Purchaser duly assembled and in good working order and condition. Purchaser further irrevocably acknowledges and agrees that, Seller has complied with each and every obligation of Seller with respect to the terms and conditions (including, but not limited to, the condition of the Aircraft as of date hereof) arising under that certain Aircraft Purchase Agreement by and between Purchaser and Seller, dated as of the ___ day of March, 2008 (the "Agreement").

**DISCLAIMER AND LIMITATION OF LIABILITY.** PURCHASER ACKNOWLEDGES THAT THE AIRCRAFT IS BEING SOLD AND DELIVERED TO PURCHASER IN "AS-IS, WHERE-IS, AND WITH ALL FAULTS" CONDITION, AND THAT ALL DELIVERY CONDITIONS SPECIFIED IN THIS AGREEMENT SHALL EXPIRE AND BE OF NO FURTHER FORCE OR EFFECT AS OF THE CLOSING. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, AND IN THE WARRANTY BILL OF SALE, SELLER DOES NOT MAKE, GIVE, OR EXTEND, AND PURCHASER HEREBY DISCLAIMS AND RENOUNCES, ANY AND ALL OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, WHETHER ARISING IN LAW, IN EQUITY, IN CONTRACT, OR IN TORT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, AIRWORTHINESS, DESIGN, CONDITION, OR FITNESS FOR A PARTICULAR USE, PURCHASER HEREBY CONFIRMING THAT IT IS NOT RELYING UPON ANY OTHER REPRESENTATION, STATEMENT OR OTHER ASSERTION WITH RESPECT TO THE AIRCRAFT. IN NO EVENT SHALL SELLER BE HELD LIABLE TO PURCHASER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND.

**PURCHASER:**

**AERO TOY STORE, LLC**

By: ______________________
Print:
Title:

BK-#8336092-FINAL-PA

**EXHIBIT E**

**WARRANTY BILL OF SALE**

**KNOW ALL MEN BY THESE PRESENTS:**

**SOCPROP SARL** ("Seller"), is the lawful owner of the full legal and beneficial title to the following tangible personal property:

> that certain Bombardier Global Express jet aircraft bearing Manufacturer's Serial Number 9076, together with two (2) Rolls Royce Model BR700-A2-20 jet engines bearing Manufacturer's Serial Numbers 12269 and 12268, and all spare parts, ground equipment, loose equipment, galley furnishings, appurtenances, appliances, instruments, components, accessions, furnishings, and other equipment attached thereto or incorporated therein, or that are in Seller's possession (collectively, the "Aircraft"); and

> all airframe, engine, and accessory logbooks, manuals, and maintenance records relating to the Aircraft that are in Seller's possession and/or control, together with a current and valid DCAL Export Certificate of Airworthiness in favor of the United States (collectively, the "Aircraft Documents").

**THAT**, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Seller does, as of the date set forth below, grant, convey, transfer, deliver and set over all of Seller's right, title and interest in and to the Aircraft and the Aircraft Documents, unto **AERO TOY STORE, LLC.** ("Purchaser"), and unto Purchaser's successors and assigns.

**THAT**, Seller hereby represents that there is hereby conveyed to Purchaser on the date hereof, all legal and equitable title to the Aircraft and the Aircraft Documents, free and clear of any and all liens, claims and/or encumbrances, and Seller will warrant and defend such title against the claims and demands of all third parties.

**DISCLAIMER AND LIMITATION OF LIABILITY.** PURCHASER ACKNOWLEDGES THAT THE AIRCRAFT IS BEING SOLD AND DELIVERED TO PURCHASER IN "AS-IS, WHERE-IS, AND WITH ALL FAULTS" CONDITION, AND THAT ALL DELIVERY CONDITIONS SPECIFIED IN THAT CERTAIN AIRCRAFT PURCHASE AGREEMENT BY AND BETWEEN PURCHASER AND SELLER, DATED AS OF THE ____ DAY OF MARCH, 2008 (THE "AGREEMENT") SHALL EXPIRE AND BE OF NO FURTHER FORCE OR EFFECT UPON DELIVERY TO PURCHASER OF THIS WARRANTY BILL OF SALE. SELLER DOES NOT MAKE, GIVE, OR EXTEND, AND PURCHASER HEREBY DISCLAIMS AND RENOUNCES, ANY AND ALL OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, WHETHER ARISING IN LAW, IN EQUITY, IN CONTRACT, OR IN TORT, AND INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, AIRWORTHINESS, DESIGN, CONDITION, OR FITNESS FOR A PARTICULAR USE, PURCHASER HEREBY CONFIRMING THAT IT IS NOT RELYING UPON ANY OTHER REPRESENTATION, STATEMENT OR OTHER ASSERTION WITH RESPECT TO THE AIRCRAFT. IN NO EVENT MAY SELLER BE HELD LIABLE TO PURCHASER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND.

**IN WITNESS WHEREOF**, Seller has caused this instrument to be executed and delivered by its duly authorized signatory as of this _____ day of _____________, 2008.

**SOCPROP SARL**

By: ____________________
Print: Cornelius Bechtel
Title: Manager

BK-#8336092-FINAL-PA

# Exhibit B

EXHIBIT A
[INTENTIONALLY OMITTED]

EXHIBIT B

PROVISIONAL ACCEPTANCE LETTER

DATE: March 11, 2008

TO: SOCPROP SARL
c/o Fortis Intertrust
65 Boulevard Grand Duchess of Charlotte
L-1331 Luxembourg
Attn: Cornelius Bechtel, Manager

RE: Completion of Provisional Inspection

Dear Sir/Madam:

Pursuant to that certain Aircraft Purchase Agreement (the "Agreement"), dated as of the 6th day of March, 2008, by and between SOCPROP SARL ("Seller") and Aero Toy Store, LLC ("Purchaser"), pertaining to that certain Bombardier Global Express jet aircraft bearing Manufacturer's Serial Number 9076 and Luxembourg Registration No. LX-VIP, this letter confirms that Purchaser has completed its Provisional Inspection of the Aircraft (as said term is defined in Section 3.2 of the Agreement) and

_____ hereby rejects the same

__X__ has found the same to be satisfactory, except for those Discrepancies noted in grey on the Addendum annexed hereto as Schedule I, and except for any additional Discrepancies discovered during Purchaser's Test Flight which shall take place when the Aircraft is scheduled to go into the Maintenance Facility and during Purchaser's Final Inspection of the Aircraft (as said terms are defined in the Agreement).

Sincerely,
AERO TOY STORE, LLC

By: [signature]
Print: RICHARD LAGGAN
Title: VICE PRESIDENT AND CFO

AGREED TO AND ACCEPTED BY:
SOCPROP SARL

By: [signature]
Print: Cornelius Bechtel
Title: Manager

**Aircraft: Global Express**
**S/N: 9076**
**March 10, 2008**
**Revision: NC**

BJAC
Business Jet Aircraft Completions

**Client:**
**Aero Toy Store**

# Observation Report

| Category | No. | Date | Arw | Description | Comments / Action | Status |
|---|---|---|---|---|---|---|
| Wing | 1 | 10.03.08 | | R/H wing , sealant missing around wing tip light housing (slat down) | | Open |
| Wing | 2 | 10.03.08 | | R/H winglet screws are corroded | | Open |
| Wing | 3 | 10.03.08 | | Found R/H wing aileron leaking, upon opening panel, main shaft assembly steering assembly and shaft has large oil residue | | Open |
| Wing | 4 | 10.03.08 | | R/H wing slat track # 3 inbd plating damaged | | Open |
| Wing | 5 | 10.03.08 | | R/H wing inbd slat # 1 seal is cut and needs to be replaced | | Open |
| Wing | 6 | 10.03.08 | | R/H wing inbd seal plate scored from slat rubbing against it | | Open |
| Wing | 7 | 10.03.08 | | R/H wing many screws are corroded on fixed L/E | | Open |
| Wing | 8 | 10.03.08 | | R/H wing Flat # 1 inbd Teflon rub strip missing QTY 2, scoring marks shown on top of Flap | | Open |
| Wing | 9 | 10.03.08 | | R/H wing Flat # 2 both Teflon rub strips are missing and scoring marks seen on top of Flat surface | | Open |
| Wing | 10 | 10.03.08 | | R/H wing Flat # 3 mid section Teflon rub strip outb peeling off | | Open |
| Wing | 11 | 10.03.08 | | L/H wing sealant missing on inbd of wing tip light | | Open |
| Wing | 12 | 10.03.08 | | L/H wing slat # 4 inbd track surface plating is damaged & track is scored | | Open |
| Wing | 13 | 10.03.08 | | L/H wing slat # 2 inbd slat track has damaged surface plating | | Open |

Case 1:09-cv-00955-RA-GWG Document 1 Filed 02/03/09 Page 33 of 42

**Aircraft: Global Express**
**S/N: 9076**
**March 10, 2008**
**Revision: NC**

**Client:**
**Aero Toy Store**

# Observation Report

| | | | | | | |
|---|---|---|---|---|---|---|
| Wing | 14 | 10.03.08 | | L/H wing slat # 4 has play of 3/8 inch at tip, this is causing large rub mark through the L/E of wing surface | | Open |
| Wing | 15 | 10.03.08 | | L/H wing Flap # 3 mid Teflon rub strips missing, resulting in scoring flap surface. | | Open |
| Wing | 16 | 10.03.08 | | L/H wing Flap # 2 mid Teflon rub strips are missing and also L/H Flap # 1 is also missing Teflon rub strips . | | Open |
| Wing | 17 | 10.03.08 | | L/H wing inbd flap has damaged friction seal, Teflon coating N/A | | Open |
| Wing | 18 | 10.03.08 | | At both upper wing sections need S/B to protect surfaces (Friction marks are present see picture) | | Open |
| Engine | 19 | 10.03.08 | | R/H Engine inlet ceramic showing many repairs | | Open |
| Engine | 20 | 10.03.08 | | R/H Engine Fan blades show many nicks (Repairable) | **Repairable within the RR limits** | Open |
| Engine | 21 | 10.03.08 | | R/H Engine inlet L/E show high pitting marks, polishing required for further compliance of serviceability | | Open |
| Engine | 22 | 10.03.08 | | L/H Engine inlet shows shield is cracked in a triangle shape at 7 o'clock, Rolls Royce to sign off | | Open |
| Engine | 23 | 10.03.08 | | L/H Engine shows many nicks on Fan blades (Repairable) | | Open |
| Engine | 24 | 10.03.08 | | L/H Engine inlet L/E scored , pitted and in poor condition, accesment must be caried out after polishing | | Open |

**Aircraft: Global Express**
**S/N: 9076**
**March 10, 2008**
**Revision: NC**

BJAC
Business Jet Aircraft Completions

**Client:**
**Aero Toy Store**

# Observation Report

| | | | | | | |
|---|---|---|---|---|---|---|
| Engine | 25 | 10.03.08 | | L/H and R/H Engine cowling Fwd surround is corroded | | Open |
| Engine | 26 | 10.03.08 | | L/H bottom engine cowling paint is peeling off because of oil contamination | | Open |
| APU | 27 | 10.03.08 | | APU support rod sign of surface corrosion visible | | Open |
| APU | 28 | 10.03.08 | | APU exhaust skin shows three (3) dents in skin | | Open |
| APU | 29 | 10.03.08 | | APU exhaust on tail has multiple pitting marks on skin | | Open |
| Gen | 30 | 10.03.08 | | Baggage light switch for Pylon inop | | Open |
| Gen | 31 | 10.03.08 | | System Hydraulic # 3 has insulation pad unglued | | Open |
| Gen | 32 | 10.03.08 | | Rear Bay shows from Hyd connection coupling FS 680 blk, has evidence of skydrol spill, paint peeling off | | Open |
| Gen | 33 | 10.03.08 | | Rear Bay ladder bushing U/serviceable | | Open |
| Gen | 34 | 10.03.08 | | Rear Bay show high heat discoloration on outer core R/H side | | Open |
| Cockpit | 35 | 10.03.08 | | All cockpit windshield and fwd windows have scratches on inside surface. | | Open |
| Cockpit | 36 | 10.03.08 | | L/H side window exterior surface frame not polished (just replaced) | | Open |
| Avi Bay | 37 | 10.03.08 | | Fwd water vacuum pump located in avionic bay on cat walk is missing cover. | | Open |
| AV Bay | 38 | 10.03.08 | | Avionic Bay FS 312 area are missing insulation bags | | Open |
| | 39 | 10.03.08 | | Cheek panel are L/H side shows Oxy tank capillary line is bent above approved limitation | | Open |
| Baggage | 40 | 10.03.08 | | Baggage door stiff to open, cable mechanism releases door dangerously | | Open |
| Baggage | 41 | 10.03.08 | | Under Baggage floor inspection showed wet Insulation blankets under newly changed water pump | | Open |
| Baggage | 42 | 10.03.08 | | Under Baggage floor R/H side recirculation motor operating out of sequence and very noisy. | | Open |

.Aircraft: Global Express
S/N: 9076
March 10, 2008
Revision: NC

Client:
Aero Toy Store

# Observation Report

| | | | | | | |
|---|---|---|---|---|---|---|
| | 43 | 10.03.08 | | Cannot find aft wardrobe flash light | | Open |
| | 44 | 10.03.08 | | Aft Baggage door is bowed cannot close properly | | Open |
| | 45 | 10.03.08 | | Aft Lav door header not fully functional, sometimes does not lift | | Open |
| | 46 | 10.03.08 | | Aft lav door travel is not controlled rubbing on headliner in Lav | | Open |
| | 47 | 10.03.08 | | Regular wear, mirror dented and scratches, aft Lav | | Open |
| | 48 | 10.03.08 | | Aft Lav sick drain lever installation out of spec | | Open |
| | 49 | 10.03.08 | | In Aft lav Wardrobe the DVD # 3 creating large interference when selected on all monitor (Scrolling image) | | |
| | 50 | 10.03.08 | | Aft Lav toilet seat cover and seat does not stay up | | Open |
| | 51 | 10.03.08 | | Aft Cabin lav door handle stiff to ops (Squeaks) | | Open |
| Aft Cabin | 52 | 10.03.08 | | Aft Cabin RHS aft window shade taking 3 time longer to close/open then the rest of windows | | Open |
| | 53 | 10.03.08 | | Aft Cabin L/H divan arm rest plug in audio port loose | | Open |
| Fw Cabin | 54 | 10.03.08 | | Fwd cabin Seat # 1 LHS reading light Inop | | Open |
| Fw Cabin | 55 | 10.03.08 | | Inside low cabinet large dark stain on material (Leak) ?? | | Open |
| Fw Cabin | 56 | 10.03.08 | | Fwd Blk at magazine rack area has multiple cracks in surface of Bulkhead. | | Open |
| Fw Cabin | 57 | 10.03.08 | | # 1 seat L/H seat tracking inop and stiff | | Open |
| Fw Cabin | 58 | 10.03.08 | | Galley area three drawers have cracked finish on veneer surface above the drawer latches | | Open |
| Fw Cabin | 59 | 10.03.08 | | Carpet in the Galley are to be replaced, regular wear, just stained | | Open |
| Fw Cabin | 60 | 10.03.08 | | Multiple drawers need to be adjusted stiff to ops and protruding | | Open |
| Fw Cabin | 61 | 10.03.08 | | Mid Cabin Pocket door secondary unlocking device is intermittent in operation | | Open |
| Fw Cabin | 62 | 10.03.08 | | Both Entrance Bulkheads have cracks at base in finish. | | Open |
| | 63 | 10.03.08 | | Carpet cut short in Cabin | | Open |
| | 64 | 10.03.08 | | Pax door stiff to close, also is gauging top and side of aircraft frame | | Open |

**Aircraft: Global Express**
**S/N: 9076**
**March 10, 2008**
**Revision: NC**

BJAC
Business Jet Aircraft Completions

**Client:**
**Aero Toy Store**

# Observation Report

| | | | | | | |
|---|---|---|---|---|---|---|
| | 65 | 10.03.08 | | Pax door bottom step S/B not carried out | | Open |
| | | | | **General Inspection Notes** | | Open |
| Engine | 66 | 10.03.08 | | Aircraft now has 2090.56 hrs the SB-BR700-72-900229 Rev 6 is now due | | Open |
| | 67 | 10.03.08 | | 90 months and 2000 hour inspections due | | Open |
| | 68 | 10.03.08 | | Fan disc upgrade required for both engines on of the last ones in service at this serial number to get done | | Open |
| | 69 | 10.03.08 | | S/B BR700-80-900340 Rev 1 Required to be accomplished | | Open |
| | 70 | 10.03.08 | | Further Engine S/B compliance is in review (Bryan) | | Open |
| APU | 71 | 10.03.08 | | Service Bulletin Compliance record not signed in APU Manual for S/B: . RE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 | | Open |
| | 72 | 10.03.08 | | Cannot find compliance to Shroud S/Bulletin compliance waiting for vendor to get back to me | | Open |
| | 73 | 10.03.08 | | Aircraft APU 2,500 hour inspection is now due | | Open |
| | 74 | 10.03.08 | | Please review notes below concerning Life limited parts for APU four (4) parts are noted to be replaced. | | Open |
| | 75 | 10.03.08 | | 1C / 2C/4C Inspections | Due | Open |
| | 76 | 10.03.08 | | Avionic /APU Batteries restoration | Due | Open |
| | 77 | 10.03.08 | | 12 month checks interior | Due | Open |
| | 78 | 10.03.08 | | 250 hour inspections | Due | Open |
| | 79 | 10.03.08 | | Oxygen Bottle Hydro check | Due | Open |
| | 80 | 10.03.08 | | Life Raft inspections | Due | Open |
| | 81 | 10.03.08 | | S/B: 700-36-023 | Due | Open |
| | 82 | | | Aircarft S/B research on going waiting on BBD file | | Open |
| | 83 | 10.03.08 | | 500 hrs/1000/1500 APU inspection | Due Sept/Aug 2008 | Open |
| | 84 | 10.03.08 | | 450/900 Landing Inspection | Due Sept/Aug 2008 | Open |
| | Note: | 10.03.08 | | Log book review and entries were verified and are satisfactory, no damage history found, no Class 1 RNC were found. Parts Tag were no all found nor did I have the time to review them. | | Open |
| | Note: | Warrante | | Airframe Green | Start 16/05/2003 End 16 May 2009 | |
| | | | | APU Parts | End 16/05/2009 | |
| | | | | Avionic Parts | Ends 16/05/2009 | |
| | Note: | | | Flight test would be a good idea posibly on its way to the maintenance down time. | | |
| | Note: | | | Paint condition, very poor sheene, many touch up' would need to be redone to posibly wait another few years prior to painting aircraft, teflon coat would also be required as L/E polishing | | |

The information and technical data herein are the exclusive property of Business Jet Aircraft Completions Inc. And not to be used or disclosed to others without the written permission of BJAC Inc.

# Exhibit C

ALLEN & OVERY

Allen & Overy LLP

# AIRCRAFT PURCHASE AND SALE AGREEMENT AMENDMENT AGREEMENT

**SOCPROP SARL,**
as Seller

and

**AERO TOY STORE, LCC,**
as Purchaser

concerning one Global Express Jet Aircraft bearing Manufacturer's Serial Number 9076 and Luxembourg Registration Number LX-VIP

Dated June 23 , 2008



**CONTENTS**

**Clause** **Page**

1. Definition and Interpretation ........ 1
2. Amendments ........ 1
3. Deposit ........ 1
4. Further Assurance ........ 2
5. Counterparts ........ 2
6. Governing Law and Jurisdiction ........ 2

**Schedule**

Signatories ........ 3



**THIS AMENDMENT AGREEMENT** (the "Amendment") is dated as of June 23 ,2008 and is being made and entered into by and

**BETWEEN:**

(1) **SOCPROP SARL,** a private company with limited liability *(société à responsabilité limitée)* organised under the laws of Luxembourg having an office c/o Fortis Intertrust, 65 Boulevard, Grand Duchess Charlotte, L-1331 Luxembourg (the "**Seller**"); and

(2) **AERO TOY STORE, LLC** a Florida limited liability company having an office at 1710 West Cypress Creek Road, Ft. Lauderdale, Florida 33309, or its assignee or designee (the "**Purchaser**").

**WHEREAS:**

(A) Pursuant to an Aircraft Purchase and Sale Agreement, dated 6th March, 2008 (the "**Aircraft Purchase and Sale Agreement**"), and made between the Seller and the Purchaser, the Seller agreed to sell one Global Express jet aircraft bearing Manufacturer's Serial Number 9076 and Luxembourg Registration Number LX-VIP (the "**Aircraft**") to the Purchaser and the Purchaser agreed to purchase the Aircraft from the Seller; and

(B) The Parties have now agreed to amend the Aircraft Purchase and Sale Agreement's provisions regarding the Closing Date, all as set forth in this Amendment.

**IT IS AGREED** as follows:

**1. DEFINITION AND INTERPRETATION**

In this Amendment (including the recitals hereto) capitalised terms defined in the Aircraft Purchase and Sale Agreement have, unless otherwise specified, the same meaning.

**2. AMENDMENTS**

In consideration of US$10 and other good and valuable consideration exchanged between the parties, the receipt and sufficiency of which the parties acknowledge, the Purchaser agrees with the Seller that:

(a) Section 4.1 of the Aircraft Purchase and Sale Agreement shall be deleted and replaced with the following clause:

"**Closing Date:** The Closing shall occur within a maximum period of three (3) Business Days after Seller's notice to Purchaser that the Aircraft has been transported to the Delivery Location, which is anticipated to be during September 2008."

(b) Section 3.1.6 of the Aircraft Purchase and Sale Agreement shall be amended to four hundred (400) hours of additional usage between the date of the Aircraft Purchase and Sale Agreement and the Closing. Notwithstanding such amendment, the Seller confirms that it aware of the originally agreed limit of 300 hours of additional usage from the date of the Aircraft Purchase and Sale Agreement until the Closing and shall endeavour to make every effort to remain within the originally agreed limit of 300 hours.

**3. DEPOSIT**

Interest accruing on the Deposit, if any, which was to be paid to the party entitled to retain the Deposit shall, in lieu thereof, be paid as follows::

    (a) to the Seller (provided it shall be entitled to retain the Deposit pursuant to the terms of the Agreement), for the period from the date of the Aircraft Purchase and Sale Agreement until 30 June 2008 inclusive; and

(b) to the Purchaser, from 1 July 2008 until the Closing; provided, however, that in the event the Purchaser is entitled to a return (refund) of the Deposit, all interest thereon shall be paid to the Purchaser.

**4. FURTHER ASSURANCE**

Save as expressly amended pursuant to this Amendment, each of the Seller and the Purchaser confirms that the Aircraft Purchase and Sale Agreement remains in full force and effect.

**5. COUNTERPARTS**

This Amendment may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of this Amendment. Such counterparts may be exchanged via facsimile transmission provided that immediately following such transmission, each party shall forward an executed original copy of the counterpart to the other party by first class mail or courier.

**6. GOVERNING LAW AND JURISDICTION**

6.1 This Agreement has been negotiated and delivered in the State of New York and shall, in all respects, be governed by, and construed in accordance with, the laws of New York, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

6.2 The provisions of clause 7.20 of the Agreement apply to this Amendment.

(*signature page follows*)




**SIGNATORIES**

IN WITNESS WHEREOF, the undersigned parties have caused this Agreement to be duly executed, delivered and effective as of the date first written above.

**Seller:**

**SOCPROP SARL**

By:
Print:
Title:

**Purchaser**

**AERO TOY STORE, LLC**

By:
Print: Richard Laggan
Title: Vice-President & CFO